**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:18cr99** |
| | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **BRIAN BREW,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

This matter arises from the government's indictment, where Defendant Brian Brew was charged with distribution of controlled substances—fentanyl and heroin—resulting in death pursuant to 21 U.S.C. §§ 841 (a)(1) and 841 (b)(1)(C). Before the court for disposition is a motion to suppress filed by Defendant Brew. (Doc. 19). Having been fully briefed, the motion is ripe for disposition.

**Background**

On January 14, 2018, Wilkes-Barre City Police Department (hereinafter "WBPD") commenced an investigation into the drug overdose death of A.C. Before the defendant's indictment, on January 24, 2018, Detective Thomas Harding of the WBPD contacted Defendant Brew for an interview. (Doc. 35, Notes of Testimony of Suppression Hrg. held on Feb. 13, 2019 (hereinafter "N.T." at 6)). The defendant consented to the interview and proceeded to the police

headquarters.  (Id.)  Detective Harding informed Defendant Brew that he was not in custody; but, out of abundance of caution, read the defendant his Miranda rights.  (N.T. at 7).

Throughout the interview, and on multiple occasions, the defendant mentioned that he would rather speak with an attorney before speaking with investigators.  (Id. at 8).  In response to each of these requests, Detective Harding and Task Force Officer Shane Yelland informed Defendant Brew that he was free to leave and that he had the right to an attorney.   (Id.)  The interview ended shortly after the defendant expressed that he wanted an attorney, stood up, and left the room. (Id. at 9).

Two months later, on March 20, 2018, Defendant Brew was indicted.  (Id. at 10).  The next day, the police department went to the defendant's Gildersleeve Street residence to take the defendant into custody.  (Id.)  When law enforcement officers arrived at the residence, the defendant was not leaning up against anything for support and the defendant communicated that he was waiting for a ride.  (Id. at 7-14).  After Detective Harding informed the defendant that they were at his residence to arrest him and take him into custody, the defendant became visibly emotional and began to sob.  (Id. at 11-13).  Although the defendant was emotional, Detective Harding observed that Defendant Brew had no trouble communicating and appeared steady on his feet.  (Id. at 12).

Fifteen minutes after law enforcement officers arrived at the defendant's residence, a transport unit picked up, handcuffed, and drove the defendant to the police station where Detective Harding and Officer Yelland conducted a second interview.  (Id. at 13).  It is during this interview that the defendant ultimately makes inculpatory remarks that he is seeking to suppress.

When law enforcement arrived at the police station with Defendant Brew, they placed him inside the same interview room that he was in during the prior interview.  (Id.)  Before the commencement of the interview, the defendant remained handcuffed and placed his head on the table due to the uncomfortable position of his arms.  (Id.)

Detective Harding asked Defendant Brew to stand up, where the defendant instinctively turned away from the detective so that his handcuffs could be removed.  (Id.)  At this stage of the custodial interview, the defendant asked for a cigarette.  (Id. at 15).  When the detective provided Defendant Brew with cigarettes, the defendant picked up the cigarettes and walked over to the window where he smoked for approximately five minutes.  (Id.)

After Defendant Brew finished smoking, Officer Yelland provided the defendant with a waiver form.  (Id. at 39).  Before the defendant signed the form,

Officer Yelland read the <u>Miranda</u> Warnings[1] out-loud while utilizing his pen to ensure that the defendant was following along.  (<u>Id.</u>)  Officer Yelland then instructed the defendant to read the warnings; and if he consented to the waiver, to initial, and then sign the document, which would indicate that the defendant understood the warnings.  (<u>Id.</u>)

After Defendant Brew signed the waiver form, *he initiated* the question of what his chances of going home were.  (<u>Id.</u> at 40).  After initiating this question, Officer Yelland responded by explaining the process of a sentencing guideline downward departure and stating that the defendant has a "50/50" chance of going home if he cooperates during the investigatory process.  (<u>Id.</u> at 41).  Officer Yelland also communicated with Defendant Brew that if he cooperated, law enforcement officers would negotiate for a potential pretrial release based upon the goals of the interview.  (<u>Id.</u>)

Throughout this interview, Defendant Brew articulately answered questions, remembered past events, provided descriptive information to the investigators, and corrected the investigators when they misheard information.  (<u>Id.</u> at 42).  During the scope of the interview, Defendant Brew never communicated that he was tired nor did he exhibit signs that he was under the influence of any

---

[1] <u>Miranda</u> Warnings provide an accused of his right to remain silent, that any statement he says may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

controlled substance. (Id. at 14). Defendant Brew admitted that he sold the drugs to Matthew Gyle that eventually killed A.C. (Id. at 63). It is these inculpatory remarks that the defendant is seeking to suppress.

On June 22, 2018, Brew filed the instant Motion to Suppress and supporting brief. (Docs. 19 and 20). This court held an evidentiary hearing on February 13, 2019. (Doc. 29). The parties have submitted post-hearing briefs bringing this case to its current posture.

**Discussion**

The issue is whether Defendant Brew, during the March 21, 2018 custodial interrogation, voluntarily disclosed to authorities that he sold the drugs to Matthew Gyle that eventually killed A.C. The Fifth Amendment of the United States Constitution specifically mandates that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." See U.S. CONST. amend. V. The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment "[bars] the introduction in federal cases of involuntary confessions made in response to custodial interrogation[s]." Withrow v. Williams, 507 U.S. 680, 688 (1993). The prosecution may not use a defendant's inculpatory statements stemming from a custodial interrogation unless it demonstrates use of procedural safeguards effective to secure privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.  The procedural safeguards necessary to secure privilege against self-incrimination requires a law enforcement officer to warn the accused of his right to remain silent, that any statement he says may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  Id.

The defendant may waive effectuation of these rights provided the waiver is made voluntarily, knowingly, and intelligently.  Id.  A confession is not made voluntarily, knowingly, and intelligently if it is considered a product of coercion.  See Lynumn v. Ilinois, 372 U.S. 528, 534 (1963).  A confession is a product of coercion if it is obtained under circumstances that overbear the defendant's will at the time of the questioning.  Id.  Here, it is undisputed that Defendant Brew was part of a custodial interrogation.  What is in dispute is whether the defendant's confession—which took place during the custodial interrogation— was a product of coercion.

Courts look at the totality of the circumstances when determining whether a confession is a product of coercion.  Miller v. Fenton, 796 F. 2d 598, 604 (3d Cir. 1986).  Using the totality of the circumstances approach requires the reviewing court to consider three particular factors in assessing whether a confession is a

product of coercion.[2]  Id.  First, the court reviews the accused's characteristics.

Id.  Second, the court looks at the details of the interrogation.  Id.  Third, the court

reviews the specific tactics utilized by law enforcement officials in eliciting the

confession.  Id.  The prosecution must establish by a preponderance of the

evidence that a challenged confession was voluntary.  Id.  We will discuss each

of these factors in turn.

## I.    Accused's Characteristics

First, the courts look at the accused's background, including his criminal

history, which could indicate how familiar the defendant is with the criminal

justice system.  Although the defendant has been convicted of 10 crimes over the

last 20 years, there is nothing in the record that reveals that on prior occasions,

Defendant Brew was given Miranda warnings or that he waived his rights, or

made any statements to the police.  The defendant's background suggests

familiarity with the criminal justice system generally; however, it does not indicate

any knowledge of the rules regarding the benefits of cooperating with the

---

[2] We recognize that the Third Circuit has also articulated a non-exclusive 6 factor
analysis for determining voluntariness.  These factors include: (1) the youth of
the accused; (2) his lack of education; (3) the lack of any advice to the accused
of his constitutional rights; (4) the length of detention; (5) the repeated and
prolonged nature of questioning; (6) and the use of physical punishment such as
the deprivation of food or sleep.  The 3 factor analysis, however, encompasses
the 6 factor test.  The 6 factor test is fact specific and only half of those factors
apply to the facts in this case.  As a result, the 3 factor analysis is relevant to the
facts and provides for a more appropriate analysis.

government in federal court.  See U.S.S.G. 5K1.1.  Therefore, the accused's background and familiarity with the criminal justice system, standing alone, does not point either way with respect to determining whether the defendant's confession was a product of coercion.

## II.    Details of the Interrogation

Next, the courts look at the conditions under which the interrogation occurred.  Defendant Brew argues that this factor should weigh in his favor because he "was either intoxicated, in fear of opiate withdrawal, or undergoing opiate withdrawal at the time of his interrogation."  (Doc. 38, Br. Supp. Mot. Suppress (hereinafter "M.S." at  11)).  As a result, the defendant claims that the conditions of the March 21 interview warrants suppression.  We disagree with the defendant.

Whether a defendant is sufficiently intoxicated to prevent him from exercising free will in speaking with a law enforcement officer is determined by the observations of a reasonable officer at the time of the interrogation.  United States v. Caple, No. 3:07CR394, 2008 WL 5146556, at *6 (M.D. Pa. Dec. 8, 2008), aff'd, 403 F. App'x 656 (3d Cir. 2010) (stating that law enforcement officers should look for evidence of intoxication when determining whether a defendant's confession was a "product of rational intellect and free will").  Here, there is ample evidence indicating that Defendant Brew's confession was a

product of rational intellect and free will.  Throughout this interview, Defendant Brew articulately answered questions, remembered past events, provided descriptive information to investigators, and corrected investigators when they misheard information.  (N.T. at 42).  During the scope of the interview, Defendant Brew never communicated that he was tired; nor, did he exhibit any signs that he was under the influence of any controlled substance. (Id. at 14).  Moreover, Detective Harding testified that it was his belief that the defendant was not intoxicated.  (N.T. at 17).  As a result, the conditions of the interrogation do not indicate that Defendant Brew's confession is a product of coercion.

### III.    Specific Tactics Utilized by Law Enforcement

Most critical in this case is the final factor, which is the conduct of the law enforcement officers.  Defendant Brew claims that Officer Yelland's communications specifically intended to convince the defendant "that only an immediate, uncounseled confession would result in Mr. Brew's pretrial release and leniency at sentencing."  (M.S. at 8).  The defendant further claims that Officer Yelland's communications regarding a downward departure were "misleading and confusing" therefore inducing Defendant Brew's confession.  (Id. at 9).  The defendant claims that Officer Yelland's statements, therefore, were a product of coercion.  We disagree with the defendant.

It is commonplace for defendants who have acquired counsel to meet with law enforcement officials and agree to cooperate with the government. See U.S.S.G. 5K1.1. The Sentencing Guidelines explicitly provide for this procedure and, upon the government's motion, give a sentencing court authority to depart below mandatory statutory minimum sentences where such cooperation is deemed substantial. Id.

Here, there is no dispute that Defendant Brew waived his rights to counsel. (N.T. at 39). Officer Yelland provided the defendant with a waiver form. (Id.) Before the defendant signed the form, Officer Yelland read the Miranda Warnings out-loud while utilizing his pen to ensure that the defendant was following along. (Id.) Officer Yelland then instructed the defendant to read the warnings himself; and, if he consented to them, to initial and then sign the document, which would indicate that the defendant understood the warnings. (Id.)

After Defendant Brew signed the waiver form, *he initiated* the question of what his chances of going home were. (Id. at 40). In response, Officer Yelland explains the process of a sentencing guideline downward departure and stated that the defendant had a "50/50" chance of going home if he cooperated during the investigatory process. (Id. at 41). Officer Yelland also communicated with Defendant Brew that if he cooperated, law enforcement officers would negotiate for a potential pretrial release based upon the goals of the interview. (Id. at 39).

It was not until after the defendant waived his <u>Miranda</u> Rights and asked about his chances of going home that Officer Yelland mentioned procedures of downward departure.  (<u>Id.</u> at 40).  Because Officer Yelland communicated regular procedures involving the Sentencing Guidelines in response to a question that Defendant Brew posed, we do not believe these communications were misleading or intended to induce the defendant into making a confession.  Therefore, the conduct of Detective Harding and Officer Yelland does not indicate that the defendant's confession is a product of coercion.

**Conclusion**

For the reasons stated above, Defendant Brew's confession was not a product of coercion.  The facts in this case, instead, indicate that the defendant's confession was voluntary.  We will, therefore, deny the defendant's motion to suppress.  An appropriate order follows.

**Date:  April 16, 2019**                                    **BY THE COURT:**

**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**